he did not, which satisfied *Robbins*' requirement of express agreement or consent. We agree with the State.

The district court asked Foster's attorney if he sought sequestration. It also asked Foster personally if it was correct that he did not seek sequestration. Foster replied that it was correct that he did not seek sequestration. This met the requirement of *Robbins* that the defendant expressly agrees to waive sequestration. We find no merit to Foster's second assignment of error.

### V. CONCLUSION

Because we find no merit to either of Foster's assignments of error, we affirm his convictions and sentences.

AFFIRMED.

INBODY, Chief Judge, participating on briefs.
HEAVICAN, C.J., not participating.

――――――――――

STATE OF NEBRASKA, APPELLEE, V.
DARRIN D. SMITH, APPELLANT.
___ N.W.2d ___

Filed November 15, 2013.    No. S-10-1232.

1.  **Trial: Joinder: Proof.** There is no constitutional right to a separate trial. The right is statutory and depends upon a showing that prejudice will result from a joint trial.
2.  **Trial: Joinder: Indictments and Informations.** The propriety of a joint trial involves two questions: whether the consolidation is proper because the defendants could have been joined in the same indictment or information, and whether there was a right to severance because the defendants or the State would be prejudiced by an otherwise proper consolidation of the prosecutions for trial.
3.  **Trial: Joinder: Juries.** A court should grant a severance only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.
4.  **Trial: Joinder: Proof.** To prevail on a severance argument, a defendant must show compelling, specific, and actual prejudice from the court's refusal to grant the motion to sever.
5.  ____: ____: ____. A defendant must show that the joint trial caused him or her such compelling prejudice that he or she was deprived of a fair trial.

6. **Pleadings: Parties: Judgments: Appeal and Error.** A denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown.

7. **Trial: Joinder.** A defendant is not considered prejudiced by a joinder where the evidence relating to both offenses would be admissible in a trial of either offense separately.

8. **Verdicts: Juries: Jury Instructions: Presumptions.** Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.

9. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

10. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

11. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

12. **Rules of Evidence: Other Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

13. ____: ____. Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2012), does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime. This rule includes evidence that forms part of the factual setting of the crime or if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime.

14. ____: ____. Where evidence of crimes is so blended or connected with the ones on trial so that proof of one incidentally involves the other or explains the circumstances, it is admissible as an integral part of the immediate context of the crime charged. Where the other evidence is so integrated, it is not extrinsic and therefore not governed by Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2012).

15. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection.

16. ____: ____: ____. An appellate court reviews for clear error the trial court's factual findings underpinning the excited utterance hearsay exception, resolving evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence.

17. **Rules of Evidence: Hearsay: Proof.** Neb. Evid. R. 801(3), Neb. Rev. Stat. § 27-801(3) (Reissue 2008), provides that hearsay is a statement, other than one

made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

18. **Rules of Evidence: Rules of the Supreme Court: Hearsay.** Hearsay is not admissible except as provided by the rules of evidence or by other rules adopted by the statutes of the State of Nebraska or by the discovery rules of the Nebraska Supreme Court.

19. **Rules of Evidence: Hearsay.** For a statement to qualify as an excited utterance, the following criteria must be established: (1) There must have been a startling event, (2) the statement must relate to the event, and (3) the statement must have been made by the declarant while under the stress of the event.

20. ____: ____. The underlying theory of the excited utterance exception is that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication.

21. ____: ____. The true test in spontaneous exclamations is not when the exclamation was made, but whether under all the circumstances of the particular exclamation the speaker may be considered as speaking under the stress of nervous excitement and shock produced by the act in issue.

22. **Constitutional Law: Witnesses: Appeal and Error.** An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and reviews the underlying factual determinations for clear error.

23. **Constitutional Law: Witnesses.** The Confrontation Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.

24. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

25. **Motions to Suppress: Confessions: Constitutional Law: Miranda Rights: Appeal and Error.** In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. With regard to historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.

26. **Constitutional Law: Appeal and Error.** Violations of the Fourth Amendment are subject to harmless error analysis.

27. **Miranda Rights: Appeal and Error.** Violations of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), are subject to a harmless error analysis.

28. **Motions for Mistrial: Appeal and Error.** Whether to grant a mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the court abused its discretion.

29. **Motions for Mistrial.** A party must premise a motion for mistrial upon actual prejudice, not the mere possibility of prejudice.

30. **Criminal Law: Motions for Mistrial: Appeal and Error.** A mistrial is properly granted in a criminal case where an event occurs during the course of a trial that is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.

31. **Trial: Photographs.** The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect.

32. **Homicide: Photographs.** In a homicide prosecution, photographs of a victim may be received into evidence for the purpose of identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent.

33. **Criminal Law: Convictions: Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

34. **Constitutional Law: Trial.** While one or more trial errors might not, standing alone, constitute prejudicial error, their cumulative effect may deprive a defendant of his or her constitutional right to a public trial by an impartial jury.

35. **Speedy Trial.** Every person indicted or informed against for any offense shall be brought to trial within 6 months, as computed under Neb. Rev. Stat. § 29-1207 (Cum. Supp. 2012).

36. **Constitutional Law: Speedy Trial.** Determining whether a defendant's constitutional right to a speedy trial has been violated requires a balancing test in which the courts must approach each case on an ad hoc basis.

37. **Judgments: Speedy Trial: Appeal and Error.** As a general rule, a trial court's determination as to whether charges should be dismissed on speedy trial grounds is a factual question which will be affirmed on appeal unless clearly erroneous.

38. **Appeal and Error.** In order to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

Appeal from the District Court for Douglas County: Peter C. Bataillon, Judge. Affirmed.

Peder Bartling, of Bartling Law Offices, P.C., L.L.O., for appellant.

Jon Bruning, Attorney General, and Stacy M. Foust for appellee.

Darrin D. Smith, pro se.

Wright, Connolly, Stephan, McCormack, and Miller-Lerman, JJ., and Cassel, Judge.

Wright, J.

## I. NATURE OF CASE

Darrin D. Smith was charged with one count of murder in the first degree, four counts of assault in the second degree, and five counts of use of a deadly weapon to commit a felony. His codefendant, Jeremy D. Foster, was charged with the same counts, and the two were tried jointly. The jury convicted both Smith and Foster on all counts, and they were each sentenced to life imprisonment plus 96 to 150 years. Smith and Foster perfected timely separate appeals to this court and assign different errors. We address their appeals in separate opinions. We affirm Smith's convictions and sentences.

## II. FACTS

### 1. Background

Brothers Victor Henderson and Cory Henderson belonged to the "Pleasantview" or "PMC" gang in Omaha, Nebraska. The defendant, Smith, was a member of the rival "40th Avenue" gang. Corey had known Smith since Corey was 15. Smith and Victor were good friends.

Corey and Victor were federally indicted in 2003 and 2004, respectively. Both agreed to plead guilty and testify for the government in exchange for more lenient sentencing. When Corey and Victor were released from federal prison in 2007, they were considered "snitches" by their community in Omaha.

Following their release, Corey and Victor first saw Smith at a party in October 2008. Smith told Corey, "We don't fuck with your kind" or "we don't mess with your kind." About 2 weeks before the shootings, Corey saw Smith again at an American Legion Hall in Omaha (the Legion). The Legion is considered a bar for Corey and Victor's gang.

On November 9, 2008, Corey, Victor, and several of their family members went to the Legion. Smith and Foster entered the bar. Both were wearing hooded sweatshirts (hoodies). They were in the Legion a short time, and before they left, they looked and nodded toward Corey and Victor.

Around closing time, Victor attempted to break up a fight in the parking lot. Smith and Foster returned, and Corey and Victor were shot. The trial testimony was in conflict as to the identity of the shooter. Officers responded to the Legion and found a chaotic scene. Five people had been shot. Victor was fatally shot in the neck. Four others were wounded.

Smith and Foster were arrested later that month. They were both charged with one count of first degree murder, four counts of second degree assault, and five counts of use of a deadly weapon to commit a felony, and their cases were consolidated for trial.

## 2. Trial Testimony

### (a) Robert Wiley

Officer Robert Wiley testified that he received a call at 12:44 a.m. on November 10, 2008. He found Victor lying in blood with a gunshot wound to his neck. Wiley observed a woman who was screaming and crying. Over Smith's objection, Wiley testified that Tamela Henderson was screaming, "It was D-Wacc, it was D-Wacc." Other testimony established that Smith is known as D-Wacc.

### (b) Corey Henderson

Corey testified that he saw two people wearing hoodies come into the Legion with the hoods over their heads. Corey said that he recognized the individual in the black hoodie as Smith. The second person was light skinned, had a braid, wore a gray hoodie, and walked with a limp. Corey testified that he had never seen the individual in the gray hoodie prior to that night. Corey later identified the individual in a gray hoodie as Foster.

While at the Legion, Smith gave Corey "a hateful look or a stare." Corey also saw Smith and Foster looking and nodding toward him and Victor. Smith and Foster left the Legion after about 10 minutes.

Later that evening, Victor attempted to stop a fight in the parking lot of the Legion. When Corey noticed that Victor turned his head, Corey turned to see what caught Victor's attention. He saw that Smith and Foster had returned and were only about 6 or 7 feet away. Smith and Foster had switched hoodies; Smith was now wearing the gray hoodie, and Foster was wearing the black hoodie.

Corey testified, "I [saw] like a gesture and then I turned real quick and I could just see a flash." The gesture was "like maybe they [were] caught off guard, or it was a movement." When Smith made the gesture, Corey did not see Smith with a gun. Corey then saw "fire" and heard "a loud boom" coming from the direction of Foster. Corey began running. Eventually, he could not run anymore because he had been shot in the leg. According to Corey, Foster was the only shooter.

At trial, Foster impeached Corey, because previously, Corey had told police that Smith had a gun and had handed it to Foster before the shooting. Corey had also told police he thought both Smith and Foster may have been shooting at him. The court instructed the jury three times that this evidence was to be used solely for impeachment.

### (c) Shampagne Swift

Shampagne Swift was at the Legion that evening and saw Smith and Foster. She had not seen Foster before, but testified he wore a black hoodie, had light skin, and had braids. Smith and Foster left the bar a different way than they entered and went past Corey and Victor's table. Later, as Shampagne was walking toward her mother's house, she heard shots.

### (d) Tameaka Smith

Tameaka Smith was in her van in the parking lot when the gunshots began. She saw someone in a black hoodie shooting a gun from either a crouching position or a shooter stance. She said the shooter was skinny and taller than her. She testified she was about 5 feet 6 inches or 5 feet 7 inches tall. She did not recall whether someone had been next to the shooter.

### (e) Martini Swift

Martini Swift saw Smith come in the bar by himself. She walked out of the bar with him for a cigarette. Smith left, and Martini lit a cigarette. She was one of the participants in the fight Victor attempted to stop in the parking lot. When Martini heard gunfire, she started to run. She did not see Smith outside the bar at the time of the shooting.

### (f) Tenisha Bennett

Tenisha Bennett was less than 5 feet from Victor as he was trying to break up the fight in the parking lot. She turned and saw a person standing close to Victor and pointing a gun at him. The man with the gun was wearing a black coat with a hood pulled far over his face. It was possible someone else was standing next to the shooter, but the shooter seemed to be alone. Tenisha's look at the shooter was brief. She knew Foster and stated she did not see him that evening.

### (g) Jacqueline Edwards

Jacqueline Edwards saw someone come into the bar with Smith. That person was light skinned, had two long pigtails, and wore a gray hoodie with the hood pulled up. Jacqueline was at a vehicle in the parking lot when she heard five or six gunshots.

### (h) Tamela Henderson

Tamela Henderson left the bar at the same time as Victor, Corey, and a few others. She was walking back toward the bar when she received a telephone call. As she walked and talked on her cell phone, she was forced to sidestep two men. She saw their faces; one was Smith, and the other was a person she had seen in the bar earlier that evening. They were wearing the same hoodies they had been wearing in the bar. Smith had a gun in his hand. She did not see Smith's companion with a gun. Tamela heard gunfire a few seconds later. She did not see the shooter. She ran to the door of the bar, someone let her in, and she stayed until the gunshots stopped. She went to the parking lot and was screaming, "It was D-Wacc."

### (i) Tequila Bennett

Tequila Bennett was with Tamela outside the bar when Tamela had to sidestep Smith and Foster. Smith and Foster were wearing the same hoodies they had worn inside the bar. Smith was taking a gun from his waistband with his right hand. Tequila was at the front door of the bar when she heard gunshots. She looked back in the direction of the gunfire and saw Smith firing the gun.

### (j) Terrance Edwards

Terrance Edwards was at the Legion when Smith made a statement before the shooting. He testified that he heard Smith say, "[W]e don't fuck with your kind."

On the night of the shooting, Terrance saw Smith and Foster come into the bar. Smith wore a black hoodie, and Foster wore a gray hoodie. Foster walked with a limp. After leaving the bar, Terrance saw Victor stop a fight. Smith and Foster arrived at the scene. Terrance testified that the two had switched hoodies, so Smith wore the gray hoodie, and Foster wore the black hoodie. They were both wearing their hoods up.

Terrance saw Foster shoot Victor. Terrance ran between cars and saw Smith and Foster chasing Corey. Foster limped after Smith as the two ran away. Terrance then realized he had been shot. He told police he had a good look at the person with the black hoodie, who had ponytails or braids. He told officers Smith was the shooter, meaning that Smith masterminded the shooting.

### (k) Christopher Spencer

Christopher Spencer was a detective with the Omaha Police Department. He conducted approximately 26 interviews for the case. Spencer interviewed Smith and testified that Smith said he had been at the Legion by himself.

Before Foster began his cross-examination of Spencer, Smith requested a sidebar, where he moved to sever and for a mistrial on the basis that Foster would elicit impeachment evidence from Spencer that would not be admitted in a separate trial of Smith. Smith argued that the prejudice from the evidence would be so great that it could not be cured by a limiting instruction. The court overruled the motions.

On cross-examination of Spencer, Foster elicited impeachment evidence against Tameaka and Corey. When Smith cross-examined Spencer, he also attempted to impeach Corey and other witnesses. Spencer testified that Smith stated to police that he had nothing to do with the shooting. Spencer admitted he received contradictory accounts of the shooting from witnesses.

### 3. Verdicts and Sentences

The jury convicted both Smith and Foster on all counts. Both were sentenced to life imprisonment for first degree murder, 40 to 50 years' imprisonment for use of a deadly weapon to commit murder, 4 to 5 years' imprisonment for each assault, and 10 to 20 years' imprisonment for each use of a weapon to commit assault. Because his sentences were consecutive, Smith's total sentence was life imprisonment plus 96 to 150 years. He received credit for 729 days served.

Smith appeals. We have a statutory obligation to hear all appeals in cases where the defendant is sentenced to life imprisonment. See Neb. Rev. Stat. § 24-1106(1) (Reissue 2008).

## III. ASSIGNMENTS OF ERROR

Smith assigns the district court erred in (1) refusing to sever his trial from Foster's; (2) allowing the State to introduce evidence of gang membership and prior bad acts without a hearing pursuant to Neb. Evid. R. 404(3), Neb. Rev. Stat. § 27-404(3) (Cum. Supp. 2012); (3) allowing the State to introduce inadmissible hearsay evidence in violation of his right to confrontation; (4) overruling his motion to suppress a statement he made to law enforcement; (5) overruling his motions for mistrial; and (6) admitting an unfairly prejudicial autopsy photograph. Smith also claims (7) there was insufficient evidence to convict him and (8) the combination of errors requires reversal. In a pro se supplemental brief, Smith assigns that (9) his speedy trial rights were violated.

## IV. ANALYSIS

Smith and Foster assign different errors. Accordingly, we address their appeals in separate opinions. We consider the errors assigned by Smith in the order they appear in his brief.

## 1. SEVERANCE

Smith first alleges the district court erred in failing to sever his trial from Foster's.

### (a) Principles of Law

[1] There is no constitutional right to a separate trial. *State v. McPherson*, 266 Neb. 715, 668 N.W.2d 488 (2003). The right is statutory and depends upon a showing that prejudice will result from a joint trial. *Id*. The burden is on the party challenging a joint trial to demonstrate how and in what manner he or she was prejudiced. *Id*. A trial court's ruling on a motion for consolidation of prosecutions properly joinable will not be disturbed on appeal absent an abuse of discretion. *Id*.

The joinder of defendants is governed by Neb. Rev. Stat. § 29-2002 (Reissue 2008), which states, in relevant part:

> (2) The court may order two or more . . . informations . . . to be tried together if the offenses could have been joined in a single . . . information . . . or if the defendants, if there is more than one, are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. The procedure shall be the same as if the prosecution were under such single . . . information . . . .
>
> (3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an . . . information . . . or by such joinder of offenses in separate . . . informations . . . for trial together, the court may order an election for separate trials of counts [or] informations . . . , grant a severance of defendants, or provide whatever other relief justice requires.

[2] As this court has interpreted § 29-2002,

> [t]he propriety of a joint trial involves two questions: whether the consolidation is proper because the defendants could have been joined in the same indictment or information, and whether there was a right to severance because the defendants or the State would be prejudiced by an otherwise proper consolidation of the prosecutions for trial.

*McPherson*, 266 Neb. at 723, 668 N.W.2d at 497.

### (b) Additional Facts

In February 2010, the State moved to consolidate Smith's and Foster's trials. Smith and Foster both argued against consolidation. Smith argued a joint trial would allow the State to present evidence against both defendants that was inadmissible against one defendant. The district court took the matter under advisement, and on April 9, it consolidated the trials.

Shortly thereafter, Smith moved to sever. He argued that if the State proceeded against Smith and Foster jointly, it could present evidence against Foster that would be inadmissible against Smith in an individual trial and that the prejudice could not be cured by a limiting instruction. He represented that witnesses would testify Foster said Smith told him to kill Victor. The court sustained Smith's motion to sever.

The State moved for reconsideration. It asserted it would not offer evidence against Smith that would be inadmissible in a separate trial. The district court subsequently issued an order reconsolidating the cases for trial.

Before trial, Smith filed an amended motion to sever. He alleged that the defendants had conflicting, antagonistic, and mutually exclusive defenses, that each would provide evidence the other committed the shooting, and that impeachment testimony would be admitted in a joint trial that would not be admitted in a separate trial of Smith. The district court took the matter under advisement and later overruled the motion. Before the presentation of evidence, both defendants again moved to sever and both motions were overruled.

### (c) Resolution

As noted previously,

> [t]he propriety of a joint trial involves two questions: whether the consolidation is proper because the defendants could have been joined in the same indictment or information, and whether there was a right to severance because the defendants or the State would be prejudiced by an otherwise proper consolidation of the prosecutions for trial.

*State v. McPherson*, 266 Neb. 715, 723, 668 N.W.2d 488, 497 (2003). We address each of these questions in turn.

### (i) Consolidation

The charges against both Smith and Foster relate to their alleged involvement in Victor's death. As Smith acknowledges, the charges in the amended information represent offenses of the same or similar character as those with which Foster was charged. Consolidation is proper if the offenses are part of a factually related transaction or series of events in which both of the defendants participated. *Id*. Accordingly, the charges against Smith and Foster could have been consolidated in a single information and the first requirement for joinder has been satisfied.

### (ii) Prejudice

Despite the potential for proper consolidation, Smith contends that he was prejudiced by the joint trial. Primarily, Smith alleges that he was prejudiced because evidence was presented that would have been inadmissible in a separate trial against him. He also alleges that he was prejudiced by the joint trial because it allowed the State to engage in the collective prosecution of him and Foster and created a situation in which the State and Foster both adduced evidence implicating Smith in the crimes. Smith's argument identifies the practical implication of collective prosecution and the "two-against-one scenario" as allowing the State and Foster to introduce evidence against Smith that would otherwise not have been admitted in a separate trial. Brief for appellant at 21. Thus, all of Smith's arguments for prejudice essentially come down to the question whether the joint trial allowed for the admission of otherwise inadmissible evidence.

Under Fed. R. Crim. P. 14(a), like under § 29-2002, severance is allowed only upon a showing of prejudice. Because of this similarity between the state and federal rules relating to severance of previously joined trials, we find federal case law to be instructive in determining when there is prejudice such that severance should be granted.

[3] Under federal case law interpreting rule 14(a), a court "should grant a severance . . . only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable

judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993). Prejudice serious enough to meet this standard may occur "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant," when "many defendants are tried together in a complex case and they have markedly different degrees of culpability," when "essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial," or in other situations. *Id*.

[4,5] A defendant seeking severance must meet a high burden. When the parties are before a trial court, "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." 506 U.S. at 540. Rather, to prevail on a severance argument, a defendant "must show 'compelling, specific, and actual prejudice from [the] court's refusal to grant the motion to sever.'" *U.S. v. Driver*, 535 F.3d 424, 427 (6th Cir. 2008) (quoting *U.S. v. Saadey*, 393 F.3d 669 (6th Cir. 2005)). Stated another way, "a defendant must show that the joint trial caused him such compelling prejudice that he was deprived of a fair trial." *U.S. v. Hill*, 643 F.3d 807, 834 (11th Cir. 2011). There is a preference for joint trials. See *Zafiro, supra*.

Even once prejudice is shown, a defendant is not entitled to severance. See *id*. The federal rule governing severance "leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts." 506 U.S. at 541. "When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but . . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." 506 U.S. at 539.

As this federal case law highlights, a joint trial can prejudice a defendant in many ways other than allowing for the admission of evidence that would be inadmissible in separate trials. The U.S. Supreme Court has recognized multiple forms of prejudice that can result from joint trial discussions of

severance under rule 14(a), which is similar to the Nebraska statute that allows for severance. See *Zafiro, supra*.

However, we do not consider these other possible forms of prejudice, because Smith does not argue them on appeal. Unlike his codefendant, Smith does not argue that the joint trial reduced the State's burden of proof or that it created the possibility of an unreliable verdict. Rather, Smith argues only that the collective prosecution and the "two-against-one scenario" resulting from the joint trial allowed for the introduction of evidence that would not have been admissible in a separate trial. Brief for appellant at 21.

[6] On appeal, "'[a] denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown.'" *U.S. v. Bauer*, 551 F.3d 786, 791 (8th Cir. 2008) (quoting *U.S. v. Noe*, 411 F.3d 878 (8th Cir. 2005)). An appellate court "will find such an abuse only where the denial caused the defendant 'substantial prejudice . . . amounting to a miscarriage of justice.'" *U.S. v. O'Connor*, 650 F.3d 839, 859 (2d Cir. 2011) (quoting *United States v. Bari*, 750 F.2d 1169 (2d Cir. 1984)). The Eighth Circuit has found that the denial of a motion to sever will be reversed only when denying severance "'resulted in severe or compelling prejudice.'" *U.S. v. Mann*, 685 F.3d 714, 718 (8th Cir. 2012) (quoting *U.S. v. Rimell*, 21 F.3d 281 (8th Cir. 1994)). "'Severe prejudice occurs when a defendant is deprived of an appreciable chance for an acquittal'" that would have existed in a separate trial. *Id.* (quoting *U.S. v. Garrett*, 648 F.3d 618 (8th Cir. 2011)).

As such, Smith has the burden of proving that he was severely prejudiced by the denial of severance. To meet this burden, Smith alleges only that he was prejudiced by the collective prosecution and the "two-against-one scenario" because it allowed for the introduction of evidence that would not have been admissible in a separate trial. Brief for appellant at 21.

[7] In the case of the joinder of offenses, "a defendant is not considered prejudiced by a joinder where the evidence relating to both offenses would be admissible in a trial of either offense separately." *State v. Schroeder*, 279 Neb. 199, 213, 777 N.W.2d 793, 805 (2010). Smith argues that this principle

should also apply to the joinder of defendants. He contends that "[b]y logical extension . . . a defendant is prejudiced by the joinder of trials where the evidence relating to one defendant would be inadmissible in a trial of a codefendant. Such was the instant case." Brief for appellant at 20.

We agree with Smith that he could have been prejudiced if evidence was in fact admitted in the joint trial that would have been inadmissible against him in a separate trial. In at least one previous case involving the joinder of defendants, we have held that joinder was not prejudicial error where the evidence to which the defendant objected would have been admissible in the trial of either defendant separately. See *State v. McPherson*, 266 Neb. 715, 668 N.W.2d 488 (2003). But we do not find that the "[e]xamples of [p]rejudice" identified by Smith show that evidence was admitted at the joint trial that would have been inadmissible against him if separate trials had been held. Brief for appellant at 20. We consider in turn Smith's examples of evidence that was allegedly admitted to his prejudice in the joint trial.

### a. Foster's Incrimination
### of Smith

Smith alleges that Foster's defense of claiming that Smith, and not Foster, was the shooter proves that Smith was prejudiced by the joint trial. He provides examples of alleged prejudice resulting from Foster's defense throughout the trial. Notably, each example relates to Foster's adducing evidence against Smith in furtherance of Foster's own defense. During a hearing on a pretrial motion in limine, Foster asked the court for an order allowing him to present Tamela's statement identifying Smith as the shooter. Smith claims this shows that joinder forced Smith to defend against both the State and Foster, creating a "two-against-one scenario." *Id*. at 21. According to Smith, Foster's opening statement further showed that Foster's defense was to "point[] the finger at Smith" by highlighting the evidence of certain witnesses. *Id*. at 22.

Smith cites other examples of Foster's adducing evidence against Smith from the evidentiary portion of the

trial: (1) Foster's cross-examination of Wiley "regarding the physical characteristics of the shooting suspect being consistent with Smith rather than Foster," *id*. at 22; (2) Foster's impeachment of Corey with statements Corey made to the police about Smith's handing a firearm to Foster prior to the shooting; and (3) Foster's questioning of Tameaka that "brought forth evidence that the shooter's physical characteristics were consistent with Smith's physical appearance," *id*. at 24. Smith contends that these individual examples of Foster's defense prove Smith was prejudiced by the joint trial. We do not agree.

The fact that Foster and the State allegedly were both trying to implicate Smith as the shooter does not show that Smith was prejudiced by the joint trial. As noted previously, this scenario could lead to multiple forms of prejudice. Nonetheless, Smith argues solely that Foster's defense of "point[ing] the finger" prejudiced Smith by introducing evidence that would have been inadmissible if offered by the State in a separate trial. *Id*. at 22. Indeed, all of his examples of prejudice identify allegedly inadmissible evidence adduced by Foster during the joint trial. But, as we will explain below, every piece of evidence identified by Smith could have been introduced by the State in a separate trial. Thus, the joint trial did not allow for the admission of otherwise inadmissible evidence by allowing Foster to incriminate Smith as part of Foster's own defense.

### i. Tamela's Statement

Smith claims prejudice because Foster filed a pretrial motion to allow him to introduce incriminating evidence against Smith in the form of Tamela's statement. Yet, Smith fails to explain why the State could not have adduced this same incriminating evidence against him in a separate trial. Although Foster, instead of the State, argued in pretrial for the admission of Tamela's statement as an excited utterance, the State could have made this same argument for the admission of Tamela's statement instead of Foster. Indeed, the State did adduce Tamela's statement at trial through Wiley and argued for its admission based on the excited utterance exception. We will address the

admissibility of Tamela's statement in Smith's third assignment of error. But assuming for the moment that Tamela's statement was admissible as an excited utterance, it would have been admissible against Smith whether Foster or the State introduced it and whether Smith was tried jointly with Foster or separately. Therefore, the fact that Foster planned to introduce Tamela's statement against Smith does not show that Smith was prejudiced by joinder.

### ii. Cross-Examination of Wiley

Smith contends he was prejudiced because Foster attempted to elicit testimony from Wiley regarding the physical characteristics of the shooting suspect, which characteristics were allegedly consistent with Smith's being the shooter, not Foster. The district court sustained Smith's objection to this line of questioning, but he nonetheless argues that the occurrence shows that he and Foster were "working against each other's interests." Brief for appellant at 22. Ultimately, Smith's argument on this issue turns on the fact that he was forced to defend against incriminating evidence elicited by Foster, instead of by the State. Smith identifies no other adverse effects from Foster's adducing this evidence rather than the State.

Because Smith was successful in keeping out Wiley's testimony about the physical characteristics of the shooter, we find no prejudice from this incident. In a separate trial, the State could have attempted to adduce this testimony from Wiley and Smith could have objected on the same grounds as in the joint trial. Otherwise inadmissible evidence was not admitted due to joinder. Rather, inadmissible evidence was excluded as inadmissible. Smith did not prove that he suffered prejudice from Foster's cross-examination of Wiley.

To the extent that Smith's argument is an attempt to highlight the conflicting nature of his and Foster's defenses in the joint trial, we find this argument to be without merit. The mere claim that defenses of codefendants are antagonistic is insufficient reason to grant separate trials where the charges against all the defendants result from the same series of acts

and would be proved by similar evidence. *State v. Pelton*, 197 Neb. 412, 249 N.W.2d 484 (1977), *abrogated on other grounds, State v. Morris*, 251 Neb. 23, 554 N.W.2d 627 (1996). Smith and Foster were both charged based on their alleged involvement in the shooting at the Legion. And given the State's theory that Smith aided and abetted Foster in the shooting, similar evidence could be used to prove that both were involved. Smith's and Foster's defenses, although conflicting, were not mutually exclusive, such that the jury could not acquit one of them, based on his defense, without convicting the other. Rather, based on the evidence, the jury could conclude that Smith committed the shootings alone, Foster committed the shootings alone, Smith and Foster committed the shootings together, or neither Smith nor Foster committed the shootings. The same evidence could be used to convict both Smith and Foster for their alleged involvement in the shootings. Therefore, the mere fact that Smith's defense conflicted with Foster's was not sufficient, under our existing case law, to mandate separate trials.

### *iii. Impeachment of Corey*

At trial, Foster impeached Corey with statements Corey made to the police about Smith's handing a firearm to Foster prior to the shooting and about whether Smith and Foster might both have been shooting at Corey. The district court admitted the evidence with a limiting instruction that the evidence was to be considered only to determine if Corey was a credible witness. The court also instructed the jury that it could not consider these statements as evidence that Smith had a gun and that impeachment referred only to challenges to the witness' memory.

[8] Smith claims that if he were tried separately, Corey would not have been impeached by Foster. But the same evidence used to impeach Corey in the joint trial would have been admissible as impeachment evidence against Corey in a separate trial of Smith. The district court issued multiple limiting instructions to the jury that the evidence was to be used only for impeachment. Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at

its verdict. *State v. McPherson*, 266 Neb. 715, 668 N.W.2d 488 (2003). Accordingly, we presume that the statements elicited from Corey on cross-examination were used in the joint trial for purposes of impeachment and not as proof that Smith had a gun. This same evidence would have been admissible in a separate trial of Smith for the purpose of impeachment. Therefore, joinder did not prejudice Smith by allowing the presentation of this impeachment evidence.

### iv. Questioning of Tameaka

Finally, Smith points to Foster's questioning of Tameaka as proof that he was prejudiced by a joint trial in which he was forced to defend against two parties. He claims that Foster elicited testimony from Tameaka that the shooter's height and weight were consistent with Smith.

In the case of this evidence, like all the other evidence identified by Smith, he has failed to show that Tameaka's description of the shooter would be inadmissible against him in a separate trial. Accordingly, he has not shown that he was prejudiced by the admission of her description in a joint trial.

### v. Conclusion as to
### Foster's Defense

In summary, Smith argues that he was prejudiced by the joint trial for the reason that he was required to defend himself against evidence adduced by both Foster and the State. But Smith has not identified any evidence Foster could introduce against him that the State could not also introduce. And he does not provide any other explanation why Foster's defense prejudiced Smith. The fact that Foster introduced evidence incriminating Smith as part of his defense did not show that Smith was prejudiced by joinder.

### b. Collective Prosecution

Smith argues that he was prejudiced by the joint trial because it allowed the State to collectively prosecute him and Foster. In support of this argument, he alleges that the State's opening statement "suggested to the jury that it could evaluate Smith and Foster collectively rather than assess their individual conduct when evaluating their culpability, if any."

Brief for appellant at 21. Smith also contends that joinder allowed the State to avoid electing which defendant committed which criminal act and, consequently, enabled the State to introduce "conflicting evidence" that could not have been introduced in a separate trial. *Id*. at 26. Considering only those arguments put forth by Smith, we find no prejudice to him in the alleged collective prosecution of him and Foster for three reasons.

First, the joint trial did not allow the State to collectively prosecute Smith and Foster without identifying the shooter, as Smith contends. The State argued to the jury that Foster was the shooter and that Smith aided Foster. It did not avoid deciding whether Smith or Foster was guilty. Rather, under the State's theory that Smith aided and abetted Foster, both were guilty of independent acts.

Second, the district court clearly instructed the jury that the guilt of each defendant was to be considered independently. Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict. *State v. McPherson*, 266 Neb. 715, 668 N.W.2d 488 (2003).

Third, despite having the burden of proving prejudice, see *id*., Smith does not explain why the State's conflicting evidence would be inadmissible in a separate trial. He merely points out that pieces of the State's evidence conflict. The pieces of evidence Smith identifies as conflicting relate to various details of the shooting and are drawn from the testimony of multiple eyewitnesses. Not surprisingly, the eyewitness accounts do not agree on all details of the shooting. But such discrepancies do not have a bearing on admissibility. As we have previously noted, where "witnesses contradict[] each other," it is "simply a matter of credibility." *State v. Pierce*, 204 Neb. 433, 438, 283 N.W.2d 6, 9 (1979), *overruled on other grounds, State v. Ellis*, 214 Neb. 172, 333 N.W.2d 391 (1983). The conflicting nature of the eyewitness testimony alone does not make it inadmissible. In the absence of any other reason why the eyewitness testimony identified by Smith was inadmissible, we find that he has failed to prove prejudice from the State's admission of such testimony at the joint trial.

### (iii) Conclusion
### as to Joinder

For all of the aforementioned reasons, we find that Smith has failed to show he was prejudiced by joinder of his case with Foster's. As such, the district court did not abuse its discretion in deciding not to sever Smith's case from Foster's. Smith's first assignment of error has no merit.

## 2. Rule 404 Evidence

Smith alleges the district court erred by admitting evidence of his gang membership and evidence of his prior acts without holding a hearing as required by rule 404(3). His challenges to the admission of evidence relate to two encounters involving Smith, Corey, and Victor in October 2008.

### (a) Principles of Law

[9-11] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Merchant*, 285 Neb. 456, 827 N.W.2d 473 (2013). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id*. An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

[12-14] Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Rule 404(2).

> [Rule] 404(2) does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime. This rule includes evidence that forms part of the factual setting of the crime . . . or if the other crimes or bad acts are necessary

for the prosecution to present a coherent picture of the charged crime.

*State v. Freemont*, 284 Neb. 179, 192, 817 N.W.2d 277, 290-91 (2012). Accord, *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006); *State v. Wisinski*, 268 Neb. 778, 688 N.W.2d 586 (2004).

> [W]here evidence of crimes is so blended or connected with the ones on trial so that proof of one incidentally involves the other or explains the circumstances, it is admissible as an integral part of the immediate context of the crime charged. . . . [W]here the other evidence is so integrated, it is not extrinsic and therefore not governed by rule 404(2).

*State v. Aguilar*, 264 Neb. 899, 909-10, 652 N.W.2d 894, 903 (2002).

### (b) Additional Facts

The State moved in limine to be allowed to introduce evidence about Smith's and Victor's gang affiliations. The State alleged that Smith was a member of the 40th Avenue gang, that Victor testified against 40th Avenue gang members, and that the gang consequently considered Victor a "snitch." The State asserted that this gang-related evidence would explain the relationship of the parties and would show motive, opportunity, and intent.

Conversely, Smith moved in limine for an order prohibiting the State from introducing evidence of gang affiliations and certain encounters involving him, Corey, and Victor. Smith contended that the encounters were sufficiently removed from the shooting to require a rule 404 hearing. The court overruled Smith's motion in limine with respect to the encounters, as well as Smith's motion to exclude evidence of gang activity.

At trial, the State sought to introduce testimony from Corey about an encounter with Smith at the house where the October 2008 party took place. Smith objected on relevance and rule 404 grounds. The court overruled Smith's objection and permitted Corey to testify about the confrontations before the shooting. The court ultimately concluded that the encounters

were evidence that provided a total picture of the charged crime, which was not subject to rule 404.

Corey then testified that he saw Smith during a party in October 2008 and that Smith said, "We don't fuck with your kind" or "we don't mess with your kind." On cross-examination, Corey stated that prior to this incident, there had been no physical altercation between Smith and Victor or between Smith and Corey.

Corey testified to another encounter with Smith that occurred in the Legion parking lot in October 2008. While inside the Legion, Smith stared and glared at Corey. Outside the Legion, Smith said, "We don't fuck with y'all kind. They ain't tripping off that other stuff. We just don't fuck with y'all kind." Corey interpreted Smith's remarks to refer to Corey and Victor's cooperation with the federal government. In response to Smith's remarks, Corey and Victor left the Legion.

### (c) Resolution

Smith claims that Corey's testimony of those encounters with Smith was subject to rule 404(2) and that a hearing should have been held according to rule 404(3). He claims the court overlooked the State's previous arguments that the evidence was relevant to show motive, intent, and opportunity, and because the evidence was offered for those purposes, a hearing should have been held.

The State claims that Smith did not request a continuing objection during Corey's testimony about the encounters and did not make a specific rule 404 objection to Corey's testimony that Smith said "'[w]e don't mess with your kind.'" Brief for appellee at 41. It claims Smith waived the right to assert prejudicial error on appeal. It asserts that the confrontations were intrinsic to the crimes and that without the evidence, the jury would be led to believe Smith and Foster randomly appeared and shot at people in the Legion parking lot. And because the evidence was inextricably intertwined with the crimes charged, the evidence was not rule 404(2) evidence and no rule 404(3) hearing was required.

Contrary to the State's argument, we find that Smith's objections to Corey's testimony were sufficient to preserve this

issue for our review. But we do agree with the State that the encounters to which Corey testified were intrinsic evidence not subject to rule 404.

In *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006), the defendant argued that the act of burning a pickup a week after the murder was extrinsic to a murder charge. We stated that in determining whether conduct is intrinsic, what matters is whether the evidence is so closely intertwined with the charged crime that it completes the story or provides a total picture of that crime.

More recently, in *State v. Baker*, 280 Neb. 752, 789 N.W.2d 702 (2010), the State presented evidence that the defendant threatened a child with harm if she reported him. Specifically, the State's evidence included testimony that the defendant threatened the victim with harm if she reported his conduct, the mother's testimony that the defendant threatened her and physically assaulted her if she did not bring the victim to the bedroom when he directed her to do so, and the mother's testimony that the defendant became sexually aroused while watching the victim administer a massage. The defendant claimed this evidence was inadmissible under rule 404(2). On appeal, we considered whether the evidence was intrinsic to the charged crimes of first degree sexual assault and third degree sexual assault of a child and concluded the State had a right to present this evidence as part of the factual setting of the crime. Bad acts that form the factual setting of the crime in issue or that form an integral part of the crime charged are not part of the coverage under rule 404(2). *Baker, supra*.

In *State v. Canbaz*, 259 Neb. 583, 611 N.W.2d 395 (2000), the defendant's neighbors and coworkers testified concerning statements the defendant made to them that he wanted to kill his ex-girlfriend. The defendant argued the statements were prejudicial evidence of prior bad acts under rule 404(2). Prior to trial, the State argued that rule 404 was inapplicable because the statements were relevant to only the murder case and were not evidence of any other crimes. The trial court concluded that rule 403 applied and held a pretrial hearing.

In *Canbaz*, we concluded the testimony was not evidence of prior unrelated bad acts under rule 404(2). The testimony was

relevant evidence that the defendant murdered his ex-girlfriend intentionally and with premeditation, and we determined that the trial court erred in concluding that rule 404(2) applied to the disputed testimony.

Similarly, evidence that Smith threatened Corey and Victor each time he saw them was part of the factual setting of the instant crimes and was necessary to present a coherent picture. Before Corey and Victor entered plea agreements with the federal government, Smith was friends with them. But the first time Smith saw Corey and Victor after their release from prison, in October 2008, Smith told them that he did not associate with their "kind." Later, Smith made a similar remark to Victor at the Legion. These were the only two times Smith encountered Corey and Victor following their release from prison. Significantly, Smith threatened them each time. Within a few weeks, on November 10, Smith acted on that threat. Evidence of Smith's previous encounters with Corey and Victor allowed the State to present a coherent picture of the eventual shooting. Without this evidence, it would appear to the jury that Smith, who was a friend of Corey and Victor, appeared at the Legion parking lot and aided and abetted in the random shooting of five people.

The evidence of the prior encounters was not used to establish that Smith had the propensity to shoot Corey and Victor, but instead, to establish that Smith threatened Corey and Victor during two separate encounters and finally acted upon those threats the night of November 10, 2008. Accordingly, the evidence was inextricably intertwined with the shooting and not subject to rule 404. The district court did not abuse its discretion in admitting this evidence. Smith's second assignment of error is without merit.

### 3. Tamela's Statement: "It was D-Wacc"

Smith claims that the district court erred in allowing testimony that Tamela said, "It was D-Wacc," when the police encountered her at the scene of the shooting. Smith argues that this statement was hearsay not covered by the excited utterance exception and that admitting the statement violated his right to

confront the witnesses against him. We address each of these arguments in turn.

### (a) Hearsay

#### (i) Principles of Law

[15,16] Apart from rulings under the residual hearsay exception, we review for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the court's ultimate determination to admit evidence over a hearsay objection. *Werner v. County of Platte*, 284 Neb. 899, 824 N.W.2d 38 (2012). We review for clear error the trial court's factual findings underpinning the excited utterance hearsay exception, resolving evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011).

[17,18] Neb. Evid. R. 801(3), Neb. Rev. Stat. § 27-801(3) (Reissue 2008), provides that "[h]earsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted . . . ." Hearsay is not admissible except as provided by the rules of evidence or by other rules adopted by the statutes of the State of Nebraska or by the discovery rules of this court. Neb. Evid. R. 802, Neb. Rev. Stat. § 27-802 (Reissue 2008). Accord *State v. Alford*, 278 Neb. 818, 774 N.W.2d 394 (2009).

[19] A hearsay statement may be admissible if it qualifies as an excited utterance, which is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Neb. Evid. R. 803(1), Neb. Rev. Stat. § 27-803(1) (Reissue 2008). For a statement to qualify as an excited utterance, the following criteria must be established: (1) There must have been a startling event, (2) the statement must relate to the event, and (3) the statement must have been made by the declarant while under the stress of the event. *Pullens, supra*. The key requirement is spontaneity, which requires a showing the statements were made without time for conscious reflection. *State v. Hembertt*, 269 Neb. 840, 696 N.W.2d 473 (2005).

[20,21] The underlying theory of the excited utterance exception is that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication. *Pullens, supra*. The true test in spontaneous exclamations is not when the exclamation was made, but whether under all the circumstances of the particular exclamation the speaker may be considered as speaking under the stress of nervous excitement and shock produced by the act in issue. *Id*.

### (ii) Additional Facts

At trial, Wiley testified that he encountered Tamela within 1 minute or less of arriving at the scene of the shooting. He stated that his attention was drawn to Tamela because "she was very upset, she was hysterical, and she was screaming." Upon approaching Tamela, Wiley found her to be "inconsolable." At trial, he was allowed to testify, over Smith's hearsay objection, to what Tamela was screaming. He recounted that she was "screaming: It was D-Wacc, it was D-Wacc, over and over again." Later in the trial, the State presented evidence that Smith was known as D-Wacc. On cross-examination, Wiley acknowledged that Tamela was uncooperative, though he explained this uncooperativeness as resulting from her emotional state. He described his attempts to question Tamela as follows: "[A]s I was asking her questions, it was kind of hard to keep her attention . . . because she was just that upset and that hysterical." Tamela still provided the shooter's race, gender, approximate age, and name. According to Wiley, it would have been obvious to Tamela that he was a police officer.

Following Wiley's testimony and outside the presence of the jury, Smith renewed his objection to the testimony about Tamela's statement. His main concerns were that the testimony violated his right of confrontation and that Tamela's statement to Riley may be unreliable. The district court overruled the objection because it found that the statement was an excited utterance. It explained the ruling as follows:

> As I understand[,] the testimony was that when [Wiley] approached [Tamela] she was . . . hysterical and screaming

> that D-Wacc did it . . . . Thereafter, while he was trying to question her, . . . it was difficult for him to obtain information from her, although he obtained information from her thereafter.
>
> But when he first came upon her, she was yelling the statement, and as such the Court found this is an excited utterance . . . .

The following morning, the court declined another request by Smith to reconsider this ruling, again noting that Wiley's testimony was that he heard Tamela scream the statement "without asking any questions or without any interrogation."

### (iii) Resolution

Smith contends that Wiley's testimony as to Tamela's statement was hearsay. He contends the statement was not an excited utterance because it was not spontaneous, but was made to implicate Smith after conscious reflection. He concludes that Tamela had time for reflection because "the record clearly demonstrates that [she], in fact, made the statement to Wiley knowing that it was fabricated." Brief for appellant at 44.

Tamela's statement was made out of court and was offered as evidence that Smith committed the shooting. It was therefore offered for its truth. Because it was an out-of-court statement offered for its truth, it was hearsay. See rule 801(3). Accordingly, it was not admissible except as provided by rule or statute. See rule 802. The State argues that the statement, "It was D-Wacc," was an excited utterance. We agree.

There was sufficient evidence before the district court to conclude that Tamela's statement met the requirements for an excited utterance. First, Wiley testified that Tamela was at the scene of the shooting, which he described as "an extremely chaotic scene." She undoubtedly experienced a startling event by being present for the shooting. Second, Tamela's statement related to the startling event because it identified the shooter. Third, the statement was made while Tamela was under the stress of the shooting. Wiley testified that his attention was drawn to Tamela, out of the entirety of the chaos, within 1 minute of arriving at the scene. He described her as "very upset,"

"frantic," and "hysterical." As Wiley testified in court, she was crying inconsolably and could not focus on the questions he was asking because she was "that upset and that hysterical." This evidence supports the conclusion that Tamela made the statement about Smith's being the shooter while still under the stress of the shooting.

The record does not support Smith's inference that Tamela had consciously reflected about the statement because she allegedly knew it was false when she said it. In the portions of the record cited by Smith, Tamela does not state that she fabricated the statement. Rather, the cited portions of the record correspond to Tamela's testimony that she did not actually see Smith in the act of shooting, but that she "figured it was him." Taken alone, this testimony might support a conclusion that Tamela consciously chose to tell Wiley that Smith was the shooter, particularly in light of the fact that she had previously accused him of shooting someone. However, shortly after the testimony cited by Smith, Tamela explained more fully that she thought Smith was the shooter because she saw him with a gun moments before the shooting. The record does not support a finding that Tamela consciously fabricated her statement that Smith was the shooter, but instead demonstrates that Tamela believed Smith was the shooter because of what she observed moments before the shooting. Per our standard of review, the State, with whom the district court sided on this matter, is entitled to every reasonable inference that can be drawn from the evidence. See *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011). We find that it is a reasonable inference from the entirety of the evidence surrounding Tamela's statement that she did not intentionally fabricate her statement that Smith was the shooter.

Although the fact that Tamela did not actually see Smith in the act of shooting is significant, it does not affect whether her statement was properly admitted as an excited utterance. To the extent that the evidence reveals that Tamela may not have had sufficient foundation to conclude that Smith was the shooter, it relates to credibility. For purposes of our hearsay analysis, the question is whether Tamela's statement was made without time for conscious reflection, not whether she was a credible

witness to the shooting. The aforementioned evidence supports the conclusion that Tamela was still under the stress of the shooting when making her statement.

We do not find clear error in the district court's conclusion that Tamela's statement was made after a startling event, in relation to the startling event, and while she was under the stress of the event. We affirm the court's decision to admit Wiley's testimony regarding Tamela's statement based on the excited utterance exception to hearsay.

### (b) Confrontation Clause

Smith contends admission of Tamela's statement via Wiley violated his right to confront the witnesses against him. He argues that Tamela was not unavailable and that her statement, "It was D-Wacc," was testimonial under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The State argues that Wiley's testimony about Tamela's statement did not violate the Confrontation Clause of the U.S. or Nebraska Constitution because Tamela testified at trial.

### (i) Principles of Law

[22] An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and reviews the underlying factual determinations for clear error. *State v. Watson*, 285 Neb. 497, 827 N.W.2d 507 (2013).

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. Amend. VI. The Nebraska Constitution provides, "In all criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face . . . ." Neb. Const. art. I, § 11. We have held that the analysis under article I, § 11, is the same as that under the Sixth Amendment to the U.S. Constitution. *State v. Hembertt*, 269 Neb. 840, 696 N.W.2d 473 (2005).

### (ii) Resolution

[23] We conclude there was no Confrontation Clause violation. There is no confrontation violation if the declarant

testifies at trial. See, *State v. Holliday*, 745 N.W.2d 556 (Minn. 2008); *People v. Argomaniz-Ramirez*, 102 P.3d 1015 (Colo. 2004). In *Crawford*, 541 U.S. at 59 n.9, the U.S. Supreme Court stated: "The [Confrontation] Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it."

Tamela testified at trial and explained her statement. Smith cross-examined her at trial about the statement. Admitting Tamela's statement, "It was D-Wacc," did not violate the Confrontation Clause of the U.S. or Nebraska Constitution. This assignment of error has no merit.

### 4. STATEMENT TO LAW ENFORCEMENT

Smith assigns that the district court erred in denying his motion to suppress his statement to law enforcement. He claims admitting the statement violated his rights under the Fourth and Fifth Amendments.

### (a) Principles of Law

[24] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Au*, 285 Neb. 797, 829 N.W.2d 695 (2013). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id.*

[25-27] In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. *State v. Bormann*, 279 Neb. 320, 777 N.W.2d 829 (2010). With regard to historical facts, we review the trial court's findings for clear error. *Id.* Whether those facts suffice to meet the constitutional standards, however, is a question of law, which

we review independently of the trial court's determination. *Id*. Violations of the Fourth Amendment are subject to harmless error analysis. See *State v. Newman*, 250 Neb. 226, 548 N.W.2d 739 (1996). Violations of *Miranda* are also subject to a harmless error analysis. See *State v. Andersen*, 213 Neb. 695, 331 N.W.2d 507 (1983).

### (b) Additional Facts

One of the officers who investigated Victor's death, Eugene Watson, worked off duty as a nightclub security guard. He saw Smith at an afterhours club on November 23, 2008. He spoke to Smith and asked him to come to the Omaha police station. Smith agreed.

A uniformed officer took Smith to the station in a police cruiser, and Smith was placed in a small interrogation room. Because Smith was intoxicated and sleeping, Watson and Spencer tried to wake him so he could interact coherently. Watson testified that while Spencer was attempting to get biographical information, Smith said "something about . . . watching TV and also he went to [the] Legion alone." Smith had not yet received the *Miranda* warnings. Once he was given those warnings, he did not speak to detectives. Smith was subsequently arrested.

Before trial, Smith moved to suppress his statements, claiming that he was detained without a warrant, consent, or probable cause, that his statements were the product of custodial interrogation without a waiver of his *Miranda* rights, and that the statements were involuntary. The court overruled Smith's motion.

At trial, Spencer testified, over Smith's objection, to Smith's statement that "he was at the . . . Legion by himself." Spencer also testified that when Smith was told police wanted to talk to him about the shooting, he said, "I had nothing to do with that."

### (c) Resolution

Smith contends that he was taken into custody without probable cause and that the State has not purged the taint of the Fourth Amendment violation. Smith claims he was in

custody because he was not free to leave during questioning, he did not initiate contact with the police, he did not want to talk, the interview was dominated by the police, and he was arrested immediately following questioning. He also claims he was interrogated by police. Smith contends the statement was involuntary because he was highly intoxicated, he did not have assistance of counsel, he was not advised that he had the right to counsel, and he was not advised that he was not required to make a statement and that any statement he made could be used against him.

The State contends that because Smith voluntarily accompanied the police for questioning, there was no Fourth Amendment seizure. It also contends there was probable cause to arrest Smith because several witnesses indicated he was one of the people responsible for Victor's death. It contends the statement was not the result of custodial interrogation because Smith's freedom was not limited in a significant way and he voluntarily accompanied the police to the station for questioning. It also contends Smith volunteered the statement that he was at the Legion alone. It argues Smith's actions and awareness as he spoke with detectives show the statement that Smith went to the Legion alone was not involuntary and that the statement was not rendered involuntary because Smith was intoxicated.

Alternatively, the State claims any error in admitting Smith's statement that he went to the Legion alone was harmless. The State argues that Smith did not confess to shooting anyone, several witnesses placed him at the scene, and the statement did nothing to support the State's theory.

We find that Smith's statements were not inculpatory. His statement that he had nothing to do with the shooting was a claim of innocence. It did not incriminate him. He also stated he was at the Legion by himself. Testimony from multiple other witnesses placed Smith at the Legion. Thus, the admission of Smith's statements was not prejudicial to Smith. Assuming without deciding that the statements should not have been admitted, their admission was harmless error. The jury's verdict was surely unattributable to Smith's statements to police, and any error in admitting the statements was harmless. See

*State v. Richardson*, 285 Neb. 847, 830 N.W.2d 183 (2013). Smith's fourth assignment of error has no merit.

### 5. Motions for Mistrial

Smith alleges the trial court erred in failing to sustain his motions for mistrial.

#### (a) Principles of Law

[28-30] Whether to grant a mistrial is within the trial court's discretion, and we will not disturb its ruling unless the court abused its discretion. *State v. Watson*, 285 Neb. 497, 827 N.W.2d 507 (2013). A party must premise a motion for mistrial upon actual prejudice, not the mere possibility of prejudice. *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011). A mistrial is properly granted in a criminal case where an event occurs during the course of a trial that is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *Id.*

#### (b) Additional Facts

Smith moved for mistrial four separate times. His first motion was made when Foster's lawyer attempted to impeach Corey. At a sidebar, Smith's attorney renewed his motion to sever and, if the motion to sever was not granted, moved for a mistrial. The motions for severance and mistrial were overruled. Smith moved for a mistrial again during the testimony of Terrance. The court concluded the evidence would have been presented at Smith's separate trial and that a curative instruction could be provided, and denied the motion. Smith moved for a mistrial a third time before the cross-examination of Spencer. Smith claimed Spencer would testify to statements that would not be admitted against Smith in a separate trial. The motion was overruled, and the court instructed the jury that the statements were to be used solely for impeachment. Spencer testified that according to his report, Tameaka described the shooter as tall and in a kneeling position. Spencer also testified that Corey had previously said something "passed" between Smith and Foster. Smith moved for a mistrial a fourth time at the end of the State's case on the basis of the court's failure to sever the trials. The motion was overruled.

### (c) Resolution

Smith contends that his motions for mistrial should have been granted because evidence was presented against him that would not have been presented against him in a separate trial. The State notes that several of the motions for mistrial were made before the challenged evidence was admitted and that Smith's motions for mistrial were made on the ground of severance. It claims Smith has not shown prejudice and the district court did not err in denying the motions for a mistrial.

Smith bases his motions for mistrial on evidence that he contends would not be presented if he were tried separately. We have rejected these arguments in concluding Smith was not prejudiced by joinder. Smith has not shown he was prejudiced, he has not shown he should have been granted a mistrial, and the district court did not err in denying the motions. His fifth assignment of error has no merit.

### 6. Post Mortem Photograph

Smith assigns the district court erred in admitting a post mortem photograph of Victor.

### (a) Legal Principles

[31] The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect. *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012).

[32] In a homicide prosecution, photographs of a victim may be received into evidence for the purpose of identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent. *Id*.

### (b) Additional Facts

At trial, the court admitted a post mortem photograph showing the fatal wound to Victor's neck. Smith made a timely rule 403 objection, which was overruled.

### (c) Resolution

Smith argues the district court abused its discretion in admitting a photograph depicting Victor's face with the fatal

wound. He contends that the court admitted other photographs showing Victor's injuries and that there was no legitimate need to introduce a photograph of Victor's face with the bullet wound. He claims the photograph was needlessly cumulative and unfairly prejudicial. The State points out that Smith challenges an exhibit that does not show Victor's face, and argues that the court did not err in admitting the exhibit Smith challenges.

Smith challenges the admission of exhibit 113, a photograph which depicts the bullet wound to Victor's neck without depicting his full face. Exhibit 111 is a photograph that does depict the bullet wound to Victor's neck along with his face. Smith objected to exhibit 113, but not exhibit 111, at trial.

We conclude the court did not err in admitting either exhibit 111 or exhibit 113. We have upheld admission of a photograph showing a decomposed body that had been burned before it was buried. See *State v. Galindo*, 278 Neb. 599, 774 N.W.2d 190 (2009). Admission of the photographs in the instant case showing the bullet wound and Victor's face was not unfairly prejudicial to Smith. His sixth assignment of error has no merit.

## 7. Sufficiency of Evidence

Smith alleges the evidence was insufficient to convict him. He claims that the State's evidence was contradictory, such that to convict him the jury would have to select some evidence to believe and ignore other evidence.

### (a) Legal Principles

[33] In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: We do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013).

### (b) Resolution

Smith contends that given the contradictory evidence in the record, in order to convict him, a trier of fact would have to select certain evidence from the State's case to believe and ignore evidence that showed Smith was not involved. The State claims that the jury weighed, rather than ignored, evidence and that the jury could have found the essential elements of the crime beyond a reasonable doubt.

We agree with the State that the jury could determine which witnesses to believe. Furthermore, the State prosecuted Smith as an aider and abettor. It presented evidence showing that Smith went to the Legion with Foster, that Smith found Corey and Victor in the parking lot, and that upon a movement or gesture from Smith, Foster fired, killing Victor and wounding Corey and three others. Tamela also testified that Smith had a gun in his hand just prior to the shooting. Based on this evidence, a rational trier of fact could have found Smith guilty beyond a reasonable doubt. Smith's seventh assignment of error has no merit.

## 8. Cumulative Error

Smith argues that the sum of all the errors in his trial requires reversal, even if any single error alone does not.

### (a) Legal Principles

[34] We have recognized the doctrine of cumulative error in the context of a criminal jury trial, stating that "while one or more trial errors might not, standing alone, constitute prejudicial error, 'their cumulative effect was to deprive the defendant of his constitutional right to a public trial by an impartial jury.'" *Hradecky v. State*, 264 Neb. 771, 781, 652 N.W.2d 277, 286 (2002) (quoting *Wamsley v. State*, 171 Neb. 197, 106 N.W.2d 22 (1960)).

### (b) Resolution

Smith contends that, taken together, the errors in the case were not harmless, but demonstrate he did not receive a fair trial, and that if the case were tried without the errors, there is a substantial likelihood the jury would have acquitted

him. The State contends that Smith's cumulative error argument lacks merit because none of his other alleged errors have merit.

We have determined that it was no more than harmless error to admit Smith's statements to law enforcement. Otherwise, we have found no merit to any of Smith's other assigned errors. Considering the evidence of Smith's guilt, we conclude that admitting Smith's statements did not deny Smith's constitutional right to a public trial by an impartial jury. Smith's eighth assignment of error has no merit.

### 9. Speedy Trial

In a pro se supplemental brief, Smith claims a violation of his statutory and constitutional speedy trial rights.

### (a) Legal Principles

[35] Smith has a statutory speedy trial right. Every person indicted or informed against for any offense shall be brought to trial within 6 months, as computed under Neb. Rev. Stat. § 29-1207 (Cum. Supp. 2012).

[36] Smith also has a constitutional speedy trial right. Determining whether a defendant's constitutional right to a speedy trial has been violated requires a balancing test in which the courts must approach each case on an ad hoc basis. *State v. Brooks*, 285 Neb. 640, 828 N.W.2d 496 (2013). This balancing test involves four factors: (1) length of delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant. *Id*. None of these four factors standing alone is a necessary or sufficient condition to the finding of a deprivation of the right to speedy trial. *State v. McLeod*, 274 Neb. 566, 741 N.W.2d 664 (2007). Rather, the factors are related and must be considered together with other circumstances as may be relevant. *Id*.

[37] As a general rule, a trial court's determination as to whether charges should be dismissed on speedy trial grounds is a factual question which will be affirmed on appeal unless clearly erroneous. *Brooks, supra*.

### (b) Additional Facts

The information in Smith's case was filed on January 9, 2009. On January 14, Smith filed a plea in abatement, which was overruled on December 24. He filed a motion to sever on May 28, 2010, which was granted on June 16. The court later reconsolidated the cases. On June 30, Smith waived his speedy trial rights from June 30 to September 27, and the court continued the trial from July 12 to September 27. Trial began on September 27.

### (c) Resolution

Smith claims that the records and files before the court do not show any cause for the delay between the filing of the plea in abatement on January 14, 2009, and the hearing on December 2. He claims that there was no just cause for the delay and that his counsel was ineffective for failing to advise him of and protect his speedy trial rights.

We conclude that Smith has not shown a violation of his statutory speedy trial rights. Smith's statutory speedy trial period began to run when the information was filed against him on January 9, 2009. See § 29-1207(2). The State had 6 months, until July 9, to try Smith. See § 29-1207(1). Under § 29-1207(4)(a), a plea in abatement tolls the running of the statutory speedy trial period. Accordingly, the time period when the plea in abatement was pending, from January 14 to December 24, is not included. This added 11 months 10 days to the speedy trial clock. The State then had until June 19, 2010, to bring Smith to trial.

The speedy trial period was tolled again on May 28, 2010, when Smith filed his pretrial motion to sever. See § 29-1207(4)(a). The motion to sever was resolved by the court on June 16, extending the speedy trial period by 19 days, to July 8. On June 30, Smith waived his speedy trial rights and the trial was continued from July 12 to September 27. The trial began on September 27. Smith was brought to trial within the time required by statute. His statutory speedy trial rights were not violated.

The next question is whether Smith's constitutional speedy trial right was violated. Smith has not shown a long delay, an impermissible reason for that delay, or that he was prejudiced by a delay. Therefore, we conclude he has not shown a violation of his constitutional speedy trial rights. Smith's final assignment of error has no merit.

[38] In his pro se supplemental brief, Smith argues his counsel was ineffective, but he does not assign ineffective assistance of counsel as error. In order to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *J.P. v. Millard Public Schools*, 285 Neb. 890, 830 N.W.2d 453 (2013). Accordingly, we do not address Smith's ineffective assistance of counsel argument.

## V. CONCLUSION

For the reasons set forth, we affirm Smith's convictions and sentences.

AFFIRMED.

INBODY, Chief Judge, participating on briefs.

HEAVICAN, C.J., not participating.

CONNOLLY, J., concurring.

During two October 2008 incidents, Smith told Corey, "We don't fuck with your kind." The majority concludes that these incidents were "inextricably intertwined" with the charged crimes. So, the majority concludes that Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2012) does not apply and that the district court did not err in admitting these incidents without a § 27-404(3) hearing. But the majority's application of the "inextricably intertwined" exception is overbroad and improperly loosens the exception from its moorings. In my view, these incidents fall under § 27-404(2) and the court therefore erred in admitting them without a § 27-404(3) hearing. I find this error harmless, however, and therefore concur in the majority's judgment.

## ANALYSIS

### Analytical Framework

As the majority notes, § 27-404(2) states, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show that he or she acted in conformity therewith." Such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." When such evidence is admissible under § 27-404(2), before the court may admit it, the State must "prove[] to the court by clear and convincing evidence that the accused committed the crime, wrong, or act."[1] And such proof must "first be made outside the presence of [the] jury."[2]

But § 27-404(2) does not apply to evidence which is inextricably intertwined with the charged crime(s):

Section 27-404(2) does not apply to evidence of defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime. This rule includes evidence that forms part of the factual setting of the crime, or evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime.[3]

We have recognized, however, that if interpreted too liberally, the inextricably intertwined exception is susceptible to abuse

---

[1] § 27-404(3).

[2] *Id.*

[3] *State v. Freemont*, 284 Neb. 179, 192, 817 N.W.2d 277, 290-91 (2012). See, also, *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006); *State v. Wisinski*, 268 Neb. 778, 688 N.W.2d 586 (2004).

and might circumvent certain procedural protections or admit evidence that § 27-404(2) was designed to exclude.[4]

Recognizing this tension between § 27-404(2) and the "inextricably intertwined" exception, we recently tried to clarify the boundary between the two. Specifically, in *State v. Ash*,[5] we noted that "[i]t is the close entanglement of the evidence [between the prior bad act and the charged crime] that creates the need to present evidence of facts that are inconsequential to proving the charged crime." And we agreed with federal courts that have found evidence inextricably intertwined with the charged offense "'when both acts are part of a single criminal episode, or when the other acts were necessary preliminaries to the crime charged.'"[6]

Similarly, in *State v. Almasaudi*,[7] we noted that inextricably intertwined evidence "is sometimes termed '"same transaction evidence."'" And we noted that the exception applies when

> the acts were inextricably intertwined with the charged offense and committed as part of a continuing crime to carry out the same objective, in furtherance of the same crime spree, to conceal previous crimes, and when the conduct was necessary to show a coherent picture of the facts of the crime charged.[8]

### Applying the Framework
### to the Facts

Here, the record shows that each incident occurred sometime in October 2008, weeks before the charged crimes on November 10, 2008. The first incident occurred at an afterhours party,

---

[4] See, *State v. Ash, ante* p. 681, ___ N.W.2d ___ (2013); *Freemont, supra* note 3 (citing *U.S. v. Green*, 617 F.3d 233 (3d Cir. 2010), *cert. denied* ___ U.S. ___, 131 S. Ct. 363, 178 L. Ed. 2d 234). See, also, *U.S. v. Gorman*, 613 F.3d 711 (7th Cir. 2010); *U.S. v. Bowie*, 232 F.3d 923 (D.C. Cir. 2000)).

[5] *Ash, supra* note 4, *ante* at 694-95, ___ N.W.2d at ___.

[6] *Id*. at 695, ___ N.W.2d at ___ (quoting 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 404.20[2][b] (Joseph M. McLaughlin ed., 2d ed. 2011) (citing federal cases)).

[7] *State v. Almasaudi*, 282 Neb. 162, 177, 802 N.W.2d 110, 124 (2011).

[8] *Id*.

during which Smith told Corey, "We don't fuck with your kind." Victor and Corey, feeling uncomfortable, stayed only 10 or 15 minutes and then left. The second incident occurred in the parking lot outside of the bar. Smith, "Don Don" Swift, and one other person surrounded Victor. Smith was not armed, but the other two had guns. "Don Don" got "in Victor's face," apparently because "he was upset about a girl." Corey tried to get Victor out of there, and Smith again told Corey, "We don't fuck with ya'll kind."

The majority concludes that the incidents were inextricably intertwined with the charged crimes and that therefore, § 27-404(2) does not apply. The majority reasons that the incidents were not used for impermissible propensity purposes, that they formed the factual setting of the crimes, and that they were necessary to present a coherent picture of the crimes.

But the record shows otherwise. First, the incidents did not form the factual setting of the crimes because both incidents occurred weeks before the charged crimes. Second, the prosecution did not need the incidents to present a coherent picture of the crimes. Without them, the following was clear from the record: Victor, Corey, and Smith were in rival gangs; Victor and Corey snitched on members of Smith's gang; snitches were reviled in the community and were in danger; and many witnesses testified that Smith was at the bar and that he participated in the shootings. The State needed nothing more to present a coherent picture of the crimes. And the incidents were not otherwise inextricably intertwined (i.e., part of a single criminal episode or in furtherance of the same crime spree).

Instead, these two incidents were § 27-404(2) evidence. And had there been a § 27-404(3) hearing at which the State proved by clear and convincing evidence that the incidents had occurred, they likely would have been admissible. But because there was no such hearing, the district court erred in admitting evidence of these incidents.

## HARMLESS ERROR

Although the district court erred in admitting the incidents without a § 27-404(3) hearing, I believe that error

was harmless. Evidentiary error is harmless when improper admission of evidence did not materially influence the jury to reach a verdict adverse to substantial rights of the defendant.[9] Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict in the questioned trial was surely unattributable to the error.[10]

Smith argues that such error was not harmless because "the State not only relied on [these incidents] (1) to establish Smith's motive to kill Victor, but (2) to distinguish Smith from any other person—40th Avenue gang member or not—against whom Victor and Corey provided incriminating evidence to law-enforcement authorities."[11] In other words, the State used these incidents to differentiate Smith from the rest of the community, in that although everyone disliked snitches, Smith was the only one that expressed hostile feelings related to snitching explicitly directed at the victims.

But these purposes were interrelated because the State used Smith's motive as an intermediate inference to prove identity.[12] And there was other strong evidence identifying Smith as a party to the crime. Multiple eyewitnesses put Smith and Foster at the bar that night. Multiple eyewitnesses testified that Smith and Foster, before the shootings occurred, had come in the bar, with their hoodies pulled up, walked through the bar, and left. Because it was a rival gang's bar, the most likely explanation for this conduct was to scope out the bar and identify their targets. Multiple eyewitnesses then identified Smith and Foster as shooting and killing Victor, and shooting and injuring Corey and three other people. Although the district court erred, I believe the error was harmless.

---

[9] See *Freemont, supra* note 3.

[10] See *id*.

[11] Brief for appellant at 38.

[12] See 1 Edward J. Imwinkelried, Uncharged Misconduct Evidence § 3:15 (rev. ed. 1999).

## CONCLUSION

I disagree with the majority's application of the "inexplicably intertwined" exception to the two October 2008 incidents which, I believe, fall under § 27-404(2). The court erred in admitting these incidents without a § 27-404(3) hearing. I conclude, however, that the error was harmless and therefore concur in the judgment.

STEPHAN and MILLER-LERMAN, JJ., join in this concurrence.

STEPHAN, J., concurring.

To the extent that both of Smith's statements to Corey in October 2008 can reasonably be understood as constituting threats, as the majority characterizes them, I agree with my concurring colleagues that they were subject to Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2012), but their admission under the "inexplicably intertwined" exception was harmless error.

I write separately only to note my view that the first of the statements, which unlike the second did not involve any display of weapons, was ambiguous and could also be reasonably understood to mean that Smith did not wish to have any involvement with Corey because he was a "snitch." So construed, I would not regard that statement as "[e]vidence of other crimes, wrongs, or acts" within the meaning of § 27-404(2). But its admission at trial would constitute, at worst, harmless error. Therefore, I concur in the judgment.

---

GRIDIRON MANAGEMENT GROUP, LLC, APPELLANT, V.
TRAVELERS INDEMNITY COMPANY, APPELLEE.

___ N.W.2d ___

Filed November 15, 2013.    No. S-12-1129.

1. **Administrative Law: Judgments: Appeal and Error.** A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act, Neb. Rev. Stat. §§ 84-901 to 84-920 (Reissue 2008, Cum. Supp. 2012 & Supp. 2013), may be reversed, vacated, or modified by an appellate court for errors appearing on the record.

2. ____: ____: ____. When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.